WINDOW ROCK DISTRICT COURT

April 21, 1982

No. WR-CV-518-81

OPINION AND ORDER

LOREN ALBERT GOLDTOOTH, Plaintiff, v.

ROZAN GOLDTOOTH, Defendant.

Honorable Tom Tso, Judge presiding.

BACKGROUND OF THE CASE

This is a case involving the disputed custody of five minor children. The Plaintiff is Loren Albert Goldtooth. He is 25 years of age and a member of the Navajo Tribe. Mr. Goldtooth is employed as a certified public accountant, and he practices his profession in Phoenix, Arizona. The defendant, Rozan Goldtooth, is 26 years of age and is presently unemployed. Mrs. Goldtooth is a member of the Hopi Tribe and she lives in the Hopi community of Moencopi, near Tuba City. There are five children of the marriage. They range in age from one to eight, and their names and ages are: Lorayne (1), Loren Albert, Jr. (4), Lynetta (5), Loretta (6) and LaVerne (8). In October of 1981 the plaintiff asked the court to determine the temporary custody of the children, and his affidavit indicated the defendant wife had physical custody of LaVerne and Loretta in Moencopi. The court was concerned about the potential for harmful effects on the children living in Phoenix due to a relationship between the plaintiff and a woman cohabiting with him, and ordered temporary custody of all the children to the wife. The court ordered a home study of the plaintiff and his surroundings, and the excellent report of the Phoenix Indian Center, Inc. was submitted to the court at the end of January, 1982. The report was based upon a home visit, an office visit and one telephone consultation. Both the plaintiff and his current wife (married following the entry of an interim divorce decree) were interviewed. The report indicates the plaintiff wants custody of the three younger children, Lorayne (1), Loren, Jr. (4) and Lynetta (5). The report concludes Mr. Goldtooth has a good relationship with the children, with good communication skills and compatable interests and desires with them. Mr. Goldtooth speaks fluent Navajo and has close contacts with the Navajo Nation in order to provide a cultural foundation for the children. The report concluded by approving Mr. Goldtooth's home and surroundings. The court also finds that Mrs. Goldtooth has a good home situation and that she provides well for the children living with her. All the children except Lynetta and Lorayne are enrolled mem-

bers of the Navajo Tribe, and Lynetta and Lorayne would be eligible for enrollment.

Following a hearing on a question of custody, the court finds both the plaintiff and the defendant to be loving and fit parents, equally eligible for an award of child custody.

SEEKING A BASIS FOR DECISION

The court, being confronted with a situation where both parents are fit and proper custodians, must wrestle with a way of reaching a decision. In the past two of the children have been with their mother and three of the children, ranging in age from one to five, have been with the father. This would seem to provide the court with a means of deciding the matter through split child custody. Apparently the court can do this, but there are dangers in such a plan:

> "Although authority can be found for the proposition that divided custody is generally to be avoided, it seems preferable to decide the question by reference to the consequences for the child in each case. The danger for the child is that shuttling between parents and divided control will cause him to feel insecure or confused. There is also the risk that each parent will use his own period of custody to destroy the child's affection for the other parent. On the other hand it is highly desireable for the child to know and have affection for both parents. And the natural desire of the parents to have more than momentary contact with his child must not be overlooked." Homer H. Clark, Jr., The Law of Domestic Relations in the United States, 590 (1968 Ed.).

There is a general caution against split or divided child custody:

> "Another issue that sometimes arises is whether siblings should be placed in the custody of one parent or should be separated. Courts usually say that the children should not be separated unless their welfare very clearly requires such a course, and this seems the best solution." Id., at 586-587.

It is obvious this court may have to consider either an all-or-nothing alternative of giving custody to one parent or take a look to see whether split custody is justified. In any event the court must seek to serve the interests of the children as being above the interests of the adults here, and given the finding of this court that the plaintiff and the defendant are professional people with the interests of their children at heart, perhaps joint custody would be an approach in this case.

The Committee on the Family of the Group for the Advancement of Psychiatry has this to say about joint custody:

"Occasionally, divorce courts award joint custody of children to both parents, although one parent's abode may be considered the permanent home. In a joint award, each party is a legal custodian and legal responsibility and parental control are divided. Such an award may prevent either party from winning or losing the custody issue, but the resulting divided authority may produce its own difficulties if the parties cannot succeed in excluding the children from their battles. Some courts, after trying joint custody on an experimental basis, have found that it did not work and have reverted back to custody in one parents. In spite of the various objections that courts are becoming more willing to consider it experimentally as a demonstration of the equal custodial rights of mothers and fathers, especially when both parents request it.

*    *    *

For many years lawyers and mental health professionals rejected joint custody out of hand and assumed it could never work. That assumption is no longer valid. At least where attitudes, logistics, and work schedules are favorable, joint custody is a feasible alternative and it may be the best substitute that can be offered to replace the intact home. But it should be remembered that joint custody entails more than shared possession of the child; it also requires shared decision-making and much effort in the care and upbringing of the child." Committee on the Family, Group for the Advancement of Psychistry, New Trends in Child Custody Determinations, 34-35 (1980).

Since the plaintiff frequently went to the Tuba City area for family purposes while following his profession in Phoenix, it appears that the logistics for joint custody may be present. The court finds the parents here to be loving and just nice people, and hopefully the necessary attitudes are there as well.

There is another aspect which this court considers in seeking a basis for its decision. We must not overlook the advantages of referring to Navajo culture and tradition, as is mandated by 7 NTC Sec. 204. One precident for the use of custom and tradition is that found in Deer v. Okpik, a child custody decision of the Family Division of the Superior Court of Quebec. (1980) 4 Canadian Native Law Reporter 93 (Cour Superieure de Quebec, division de la famille, 1980). In that case a Caugnawaga Mohawk father sought the custody of his three-year-old son as against his Koactac Inuit (Eskimo) wife. After the child was born the couple lived together for eleven months, and then the mother returned to her home with the child. The mother was then employed as a translator, working various places, and the child was left to live with his maternal grandparents. That arrangement gave the child Inuit

cultural surroundings. While the father was separated from the child and the mother was working in various places, the little boy-Sunchild-lived with his grandparents, who considered him as their own child. Id., 94. The mother, without legal formalities, gave Sunchild to his grandparents in adoption in accordance with the tradition, custom and ways of the Inuit. Id. Under that custom, the court found there was no abandonment of the child by the mother. Id. The court also found Sunchild had been totally integrated into his grandparents' Inuit culture. Id., 95. While recognizing the natural law rights of the parents, the court held, in reasoning adopted by this court, that the dominant principle to guide the court is always that the interests of the child are the principal factor to be considered. Id., 96. The court saw that there had been an adoption in accordance with Inuit custom and that the child was integrated into the Inuit community. To look to an award to either natural parent would be to disrupt the child's integration into the Inuit culture. While the court concluded that the parents could not be blamed for their conduct, it found that the best interests of the child required that he remain with his Inuit grandparents. The court also found that ancesteral customs and traditions must be preserved under the law and that the decision of the court was in harmony with the Inuit customs and traditions presented to it. Id., 97. Based on those findings the court granted the mother the legal custody of the child, gave his physical custody to the grandparents and gave the father visitation rights for three months during the summer. Id.

Deer v. Okpik, a case from the French civil law jurisdiction of Quebec, is cited for its excellent reasoning and its recognition of the fact you cannot separate native peoples from their culture and tradition. This court takes judicial notice of the fact that in Navajo culture and tradition children are not just the children of the parents but they are children of the clan. In particular, children are consider members of the mother's clan. While that fact could be used as an element of preference in a child custody case, the courts wants to point out that the primary consideration is the child's strong relationship to members of an extended family. Because of those strong ties, children frequently live with various members of the family without injury. This is the condition throughout Indian Country (as Indian reservations as a whole are called). Therefore the court looks to that tradition and holds that it must consider the childrens' place in the entire extended family in order to make a judgment based upon Navajo traditional law.

This approach is in harmony with modern trends in child psychology as well. It is interesting to note that the Anglo-European society is increasingly discovering ways which we have known for centuries. Again referring to the views of the Group for the Advancement of Psychiatry (which has about 300 members), they note:

> "A family is bound together by intense and long-lasting ties of past experience, social roles, mutual support, and expectations. It constitutes an interactive milieu in which transactions between individual family members are continually taking place. The action of any one member affects the whole family. A ripple set up anywhere, internally or externally, makes itself felt through the entire system." New Trends, cited above, 57.

What all that means is that in a divorce the children must be given continuing and full contact not only with their parents but with their extended families, because every member of the family depends upon the others. The court must consider the "family perspective" and look providing "continuity and mutuality of family relationships" in spite of a divorce. Id., 99. The reality is that a divorce changes the form of relationship of family members but it does not end the family. Id. 99-100. Therefore there are two recommendations of the Committee on the Family, Group for the Advancement of Psychiatry which this court will adopt:

> 1. "The court's determination should aim at providing the child with an ongoing relationship with as many members of his or her family of origin as possible."

> 2. "In determining parental competence, the court should seriously consider the comparative willingness of the two contestants to provide the child with access to the other parent, to siblings, grandparents, and other relatives." Id. 146-147.

The court has sought a basis for its decision and finds it in Navajo custom and tradition, reinforced by modern principles of child psychology. This family is in an excellent position to be maintained in harmony, notwithstanding the sorrow of divorce, and I hold that the best interests of these children require an award of joint custody to their parents.

Since we have here a Navajo father and a Hopi mother, a little should be said about the concept of joint custody as it appears to the court. The court will not follow the tragic precident of the Navajo-Hopi Joint Use Area by failing to set guidelines for joint custody or arbitrarily dividing the children among the parents with no concern for those children. This court will enforce the childrens' rights in custody and it will only incidently provide for the rights of the parents, where they are in harmony with those of the children. This court feels family ties and strengths should be enforced.

One problem in defining the conditions of joint custody is that the "law is incapable of effectively managing, except in a very gross sense, a delicate a relationship as that between parent and child." Goldstein, Freud, Solnit, Beyond the Best Interests of the Child, 8 (1973); Cited with approval, New Trends, above 41.

Therefore the thrust of the court's order will be require the parents here to devise a plan for submission to the court which will maintain strong family ties and full access to the children and among the children.

THE DECISION

Having found the parents here to be fit, and having found a possible ground for joint custody, the court will order the submission of a child custody plan jointly agreed to by the parties within 30 days. The court fully has in mind the fact children should not be shunted

back and forth between the parents by court order, and the joint custody arrangement should be flexible. It is therefore

ORDERED:

1. That the parties submit a plan to the court within 30 days of the date of this order outlining the conditions for physical custody of the children, full visitation and access of the children among the parents and siblings and arrangements for their economic needs. Physical custody should follow past actual physical custody patterns;

2. The plan will be developed by the parents after fully discussing the welfare of their children together, and it will contain all necessary matters to which the parents agree and those on which they do not agree,

3. The plan will fully consider family oriented arrangements for the children to have access to and be loved by each parent and members of the extended families of both parties, in accordance with the principles set forth above;

4. The court will enter its final judgment of joint custody after reviewing the plan submitted and reviewing custody at the time;

5. The plan must contain provisions providing that the parent who has physical custody of a child or children will have full authority to authorize and plan medical treatment or other needed services for the child which require parental authorization, notwithstanding joint legal custody;

6. While the court, in approving a plan, will not lightly or without substantial cause alter it, the joint custody plan and judgment based upon it will be subject to review to make certain the principles set forth in the opinion above are followed;

7. Upon submission of the plan the parties will indicate a date which is agreeable to them for a final hearing on the matter, in accordance with the distance they must ravel and their convenience.